## THE ILLINOIS STEEL COMPANY

### *v.*

### HENRY BAUMAN.

*Opinion filed February 17, 1899.*

1. MASTER AND SERVANT—*servant does not assume every risk incident to employment.* While one employed in a steel mill to cool molten metal by pouring water upon the moulds assumes the risk of explosions from the unavoidable escape of small quantities of slag from the ladle to the moulds, he does not assume, as a matter of law, the risk of an explosion due to the intentional act of another employee in pouring a large quantity of slag into a mould.

2. FELLOW-SERVANTS—*servants of same master are not necessarily fellow-servants.* If the business of the master is divided into separate departments, a laborer in one department is not necessarily a fellow-servant with a laborer in another.

3. SAME—*when question of fellow-servants is for the jury.* Whether employees in a steel mill are fellow-servants is a question properly left to the jury, under evidence tending to prove that they were under different foremen, worked in different parts of the plant, not within sight or hearing of each other, and were not brought directly together in the discharge of their duties.

*Illinois Steel Co.* v. *Bauman,* 78 Ill. App. 73, affirmed.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Will county; the Hon. JOHN SMALL, Judge, presiding.

GARNSEY & KNOX, and WILLIAM DUFF HAYNIE, (E. H. GARY, of counsel,) for appellant.

JOHN W. D'ARCY, (GEORGE S. HOUSE, of counsel,) for appellee.

Mr. JUSTICE BOGGS delivered the opinion of the court:

The appellee obtained a judgment against the appellant company in the circuit court of Will county in an action on the case for damages sustained by reason of personal injuries received while in the employ of the company. This is an appeal from a judgment of the Ap-

pellate Court for the Second District affirming that of the circuit court.

The sufficiency of the declaration was not challenged by demurrer, but the plea of not guilty was interposed. At the close of the evidence for the appellee the appellant company moved the court to exclude the evidence and to instruct the jury empaneled to try the issues in the case to return a verdict that it was not guilty. The court denied the motion and the company saved exceptions. The cause was then submitted to the jury upon the evidence produced in behalf of appellee. But one instruction was given, and that at the instance of the appellee. It defined the relation of fellow-servant, and it is not urged the definition given is in anywise objectionable. No complaint is made of rulings of the court as to the admissibility of evidence. The record therefore presents but a single question: whether the circuit court erred in overruling the motion of appellant to exclude the testimony and peremptorily direct a verdict in its favor.

It appeared in the testimony the appellant company, at the time appellee was injured, was engaged in manufacturing steel from iron ore, and maintained a large plant at Joliet, comprising a number of buildings and structures. One of the buildings was known as the "converting room" or "mill." In the converting room of this "mill" were two large vessels, in which melted iron was converted into steel by the Bessemer process. After the process of conversion has been completed, the product, in molten condition, is drawn from the vessels into a large receptacle termed a "ladle," from which it is drawn, through an opening in the bottom of the ladle, into iron moulds. The capacity of the ladle is equal to that of six of the moulds. These moulds, in groups of six in number, are brought into the converting room upon cars and made to pass under the ladle. The ladle is provided with a tube in the bottom thereof, to allow the melted metal to run from it into the moulds. The tube is opened and

closed by means of a lever operated by an employee called a "pourer." A substance called "slag" is always present in the metal in the ladle. It is lighter than the metal, and most usually rises to the top. If slag is permitted to enter the moulds it is likely to cause an explosion when the moulds are cooled for the purpose of removing their contents. It is the duty of the pourer to so manipulate the lever as to stop the flow from the ladle the moment he sees, from its color, that slag is beginning to enter the moulds. The admission of slag into a mould in a quantity equal to the depth of one-half an inch within the mould would likely cause an explosion when the mould is cooled and uncapped. It is the duty of the pourer to exercise care to prevent slag from entering the moulds, but it is apparent that exercise of ordinary care in this regard will not always avail to wholly prevent the escape of slag from the ladle into the moulds. The slag being usually at the top of the metal within the ladle will not make its appearance until the contents of the ladle are well nigh exhausted, and its presence is therefore to be expected when the last one of the six moulds is being filled. As soon as the slag commences to pass from the ladle it is the duty of the pourer to shut it off from the moulds and to cause it to be emptied from the ladle into a receptacle called a "butt," which is provided for the purpose of receiving and holding it. When the contents of the ladle proper to be received in the moulds has been emptied therein the moulds are closed by a covering called a "cap," and the cars upon which they are loaded are moved out of the converting room upon a track which leads to another building where the contents of the moulds, after they have cooled and hardened, are removed from the moulds by a process called "stripping." The product is then called "ingots" or "billets" of steel. After passing out of the converting mill, but before reaching the department of appellant's plant where the moulds are stripped from the billets, the cars containing the

moulds are stopped at a platform erected beside the track, for the purpose of preparing the ingots or billets for the final process of stripping the moulds from them. This is accomplished by chilling the moulds with water from a hose and removing the caps. On the occasion when the appellee was injured he was stationed on that platform and engaged as an employee of the appellant company in throwing water from the hose upon the moulds and removing the caps therefrom. One James Bartley was, on the same occasion, employed as pourer of the metal from the ladle to the moulds in the converting room. It appeared that though Bartley knew that if slag was allowed to pass into the mould, even in such small quantity as one-half of one inch in thickness, it would almost inevitably cause the mould to explode when uncapped, he purposely allowed slag to flow from the ladle into the last or sixth of a group of moulds in such quantity that it filled said mould to the extent of one foot in thickness of the slag. It further appeared that when that mould was stopped at the platform where the appellee was stationed it fell to the appellee to chill and uncap the same, and in so doing the mould exploded with great force and violence, whereby a large quantity of the molten metal was thrown upon the head, shoulders, arms and other parts of the person of the appellee, severely burning and injuring him.

It is urged by the appellant company that explosions of the moulds constitute one of the usual and ordinary perils of the employment of those engaged in the work of cooling and uncapping the moulds, and is therefore assumed by one accepting such employment, and further, that the pourer bore the relation of fellow-servant to one so engaged; and for these reasons it is urged the court should have excluded the evidence from the jury and directed a peremptory verdict of not guilty.

It appeared from the evidence that notwithstanding the exercise of ordinary care by the pourer to prevent

the passage of slag into the moulds some slag would at times find its way from the ladle into a mould and that explosions would at times probably occur. It was not, however, reasonably to be apprehended that the pourer would fail to detect the presence of any considerable quantity of slag, and that therefore explosions would but infrequently occur, if at all, and would, in any event, be but slight in character and not likely to be followed by any serious results. "An employee does not assume all the risks of a service in which he may be engaged, but he assumes only ordinary, obvious or known risks." (Wood on Master and Servant, 385.) The servant assumes only such risks as are incident to his employment or as are usual or ordinary, and which remain so incident after the master has taken reasonable care to prevent them. (*Chicago and Alton Railroad Co.* v. *House,* 172 Ill. 601.) A servant assumes risks of known dangers—such as are so obvious that knowledge of their existence may be fairly presumed; but the law does not imply that he has any notice of dangers not obvious to the senses, and arising out of extraordinary circumstances. (*Pittsburg Bridge Co.* v. *Walker,* 170 Ill. 550.) Appellee, it may be conceded, assumed all of the ordinary, obvious or known risks of the service in which he was engaged. The danger aris-ing from explosions, which were liable to happen from the unavoidable escape of small quantities of slag from the ladle into the moulds, it may also be conceded was one of the ordinary and known risks, and, as such, was assumed; but it cannot be said that an explosion occa-sioned by the intentional act of a pourer in purposely permitting slag to pass into the moulds in a quantity known to be dangerous is, as a matter of law, one of the ordinary, usual and known risks of his employment. Whether it is so is a question of fact—not of law. The evidence justified the submission of the question to the jury as a question of fact.

The court having correctly defined to the jury the relation of fellow-servant, it only remains to determine whether the evidence justified the submission of that question to the jury as a question of fact. Appellee and the pourer, Bartley, were employees of the same master and were engaged in the promotion of the general enterprise of the master. But we recognize the rule that if the business of the employer is divided into separate departments a laborer in one department is not necessarily a fellow-servant with a laborer in another and separate department, though both are servants of the same master. In order that workmen be fellow-servants within the rule which obtains in this State, it is not sufficient they are serving the same master, but it is essential they shall, at the time of the injury complained of, be actually co-operating with each other in the particular business in hand in the same line of employment, or that their duties are such as to bring them into habitual association, so that they may exercise a mutual influence upon each other promotive of proper caution. This has been declared so often by this court to be the rule it is unnecessary any of the numerous decisions should be cited. The evidence tended to show that Bartley was employed in one department of appellant's plant denominated the converting room or mill, which was devoted to a particular branch of its business,—*i. e.*, converting iron into steel. The process of conversion left the steel in a molten condition in the moulds hereinbefore mentioned. It maintained another department of its business which was devoted to the work of removing the steel from the moulds, called "stripping" the moulds. The evidence further tended to show the first step in the process of stripping was performed by appellee. The converting mill and the employees therein were under the control of a superintendent, and the appellee was subject to the control of another and different principal servant, called the "yard foreman." The further tendencies of the evi-

dence were, the pourer and the appellee were not stationed in the same building or within sight or hearing of each other, and that the usual duties of their respective employments did not bring them into habitual or even temporary association. In this state of the proof, whether the appellee and the pourer were directly co-operating in a particular business in the same line of employment, or whether their usual duties brought them into habitual consociation so that they might exercise an influence, each upon the other, promotive of proper caution, was a question of fact for the jury.

The errors assigned are not well taken, and the judgment must be and is affirmed.            *Judgment affirmed.*